UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUANITA MICHELLE-LYNN ELAM,

       Petitioner,

                            CASE NO. 2:07-CV-11650

   v.                        JUDGE DENISE PAGE HOOD
                            MAGISTRATE JUDGE PAUL J. KOMIVES

MILLICENT WARREN,

       Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.   *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    D.   *Double Jeopardy (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    E.   *Sufficiency of the Evidence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    F.   *Evidence and Prosecutorial Misconduct Claims (Claims III and IV)* . . . . . . . . . . . . . . . . . . . . 21
        1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           a. Crime Scene Photo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           b. Photos of Victims with Their Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    G.   *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
III.  NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

\*     \*     \*     \*     \*

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.   REPORT:

_____

[1]By Order entered this date, Millicent Warren has been substituted in place of Clarice Stovall as the proper respondent in this action.

A.    *Procedural History*

1.    Petitioner Juanita Michelle-Lynn Elam is a state prisoner, currently confined at the Huron Valley Correctional Facility–Women's Complex in Ypsilanti, Michigan.

2.    On November 23, 2004, petitioner was convicted of two counts of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a); killing an unborn child, MICH. COMP. LAWS § 750.322; two counts of first degree felony murder, MICH. COMP. LAWS § 750.316(1)(b); two counts of assault with intent to murder, MICH. COMP. LAWS § 750.83; two counts of armed robbery, MICH. COMP. LAWS § 750.529; and first degree home invasion, MICH. COMP. LAWS § 750.110a(2), following a jury trial in the Wayne County Circuit Court.  Petitioner was tried jointly with her codefendants Jairus Perkins and John Henry Ray.  On December 14, 2004, petitioner was sentenced to mandatory terms of life imprisonment without possibility of parole on the felony murder convictions, a term of 10-14 years' imprisonment on the killing an unborn child conviction, terms of 20-60 years' imprisonment on the assault convictions, terms of 10-60 years' imprisonment on the robbery convictions.[2]

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.    THE CONVICTIONS FOR FELONY MURDER AND THE PREDICATE FELONY, ARMED ROBBERY, VIOLATED THE UNITED STATES AND MICHIGAN CONSTITUTIONS' PROHIBITION AGAINST DOUBLE JEOPARDY.

II.   MS. ELAM'S MOTION TO QUASH AND MOTION FOR A DIRECTED VERDICT SHOULD HAVE BEEN GRANTED, AS THE PROSECUTION FAILED TO PRESENT LEGALLY SUFFICIENT EVIDENCE THAT SHE

---

[2]Petitioner was also sentenced to terms of life imprisonment on the premeditated murder convictions and to a term of 10-20 years' imprisonment on the home invasion conviction.  These sentences were vacated by the trial court in light of the sentences on the felony murder convictions.

ACTED IN CONCERT WITH THE TWO PERPETRATORS.

III.   DEFENDANT'S DUE PROCESS RIGHT TO BE CONVICTED ONLY ON THE BASIS OF LEGALLY SUFFICIENT EVIDENCE WHEN DEFENDANT WAS CONVICTED AS AN AIDER AND ABETTOR TO FELONY MURDER, AND . . . THE PROSECUTOR FAILED TO ESTABLISH CIRCUMSTANTIALLY THAT DEFENDANT AIDED IN THE CRIME.

IV.   THE TRIAL COURT VIOLATED MS. ELAM'S DUE PROCESS RIGHTS BY INTRODUCING A CLOSE-UP PHOTOGRAPH OF THE DECEDENT'S BODY WHERE THE DANGER OF UNFAIR PREJUDICE DUE TO THE GRUESOMENESS OF THE PHOTOGRAPH SUBSTANTIALLY OUTWEIGHED ANY PROBATIVE VALUE.

V.   THE PROSECUTOR VIOLATED MS. ELAM'S STATE AND FEDERAL DUE PROCESS RIGHTS TO A FAIR TRIAL BY IMPROPERLY ATTEMPTING TO EVOKE AN EMOTIONAL RESPONSE FROM THE JURORS BY APPEALING TO THEIR SYMPATHY FOR THE VICTIMS. US CONST AM XIV; MICH CONST ART I SEC 17.

In an appeal consolidated with those of her codefendants, the court of appeals found no merit to petitioner's claims, and affirmed her conviction and sentence. *See People v. Perkins*, No. 259865, 2006 WL 1330320 (Mich. Ct. App. May 16, 2006) (per curiam).

4.   Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Elam*, 477 Mich. 940, 723 N.W.2d 831 (2006).

5.   Petitioner, through counsel, filed the instant application for a writ of habeas corpus on April 12, 2007. As grounds for the writ of habeas corpus, she raises the claims that she raised in the state courts, with the exception of the second claim.

6.   Respondent filed her answer on December 12, 2007. She contends that petitioner's prosecutorial misconduct claim is barred by petitioner's procedural default in the state courts, and that petitioner's remaining claims are without merit.

3

B.      *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at trial was accurately summarized in the prosecutor's brief in the

Michigan Court of Appeals:

On July 18, 2004 shots rang out and two victims of an armed robbery panicked as they thought about what was happening to their friends who were inside the home at 29019 Northline Road in Romulus. Deshone Douglas Moore was in the wrong place at the wrong time. He had three gunshot wounds to the head–one at close range, one near contact, and one direct contact. Moore was also shot in the abdomen and upper arm. He died of multiple gunshot wounds. Amanda Zarbaugh was executed in her own home as she ran from the living room toward the bathroom in the back of the house. The muzzle of the gun was placed to her head and she was shot twice. Zarbaugh was four-months pregnant when she died. Like Moore, Zarbaugh had two gunshot wounds to the head–one close contact and one direct contact. T II 49-62. Moore had come with Christopher Anthony Straughter and had only been at the house minutes before he was murdered.

Although she had never been invited to Zarbaugh's house and she didn't really even know Zarbaugh, Juanita Michelle Elam went to visit Zarbaugh's home on that day and told Zarbaugh she wanted to buy some drugs from Straughter, one of the victims who was being held at gunpoint outside the residence. Elam was the girlfriend of Jairus Andrae Perkins, the man the prosecutor believed fired the fatal shots at Moore and Zarbaugh, killing Moore, Zarbaugh and Zarbaugh's unborn baby. T II 50-56, 74. The prosecutor believed Elam was at Zarbaugh's home to set up the robbery that resulted in the fatal shooting of Moore and Zarbaugh–she was the lure, and would tell Perkins and Ray when they were at the house. Two survivors lived to tell about these events–Straughter and Booker. The defendants did not intend to leave survivors. They were armed, had killed Moore and Zarbaugh, and Perkins was about to kill Straughter and Booker, but that plan failed. Perkins pointed the gun at Straughter, but Straughter, seeing it was empty, grabbed it. Then Perkins grabbed the gun from Ray but that gun jammed and would not fire. The survival of Straughter and Booker was thus simply fortuitous. T II 33-35, 145-147, 158-160; T III 45.

Illustrative pictures of the victims and the crime scene were admitted. T II 163-166. In Zarbaugh's house were found eight 9 mm Luger spent shell casings–six in the living room and two in the hallway. Six of the shots came from the same gun, the other two casings were similar, but no definite conclusion could be made as to whether they too came from the same gun. No money or weapons were found in the house, but a small bag of crack cocaine was found inside the house and an additional bag was found in the front yard of the house. The house was not tested for fingerprints. T II 121-134, 149, 153-154, 173-174. The gun used belonged to Patrick Kessling, but was taken from his home by Perkins and Ray some time before July, 2004. T IV, 215-219.

What was the reason for this crime?  Straughter, Zarbaugh, Moore, and Booker did not really even know the defendants, Perkins, Ray, and Elam.  T II 163-164.  Why was Elam at Zarbaugh's house waiting to buy drugs from Straughter when her own boyfriend sold drugs?  T III 215-216.  One of the guns used belonged to Patrick Kessling.  Kessling's gun was taken from him by Perkins and Ray as collateral for a $1600.00 drug debt.  T III 216.  Straughter met Booker about two weeks before July 18, 2004.  On July 17, 2004, Straughter picked up Booker during the day then rented a room at the Quality Inn so she would have a place to stay while he drove around.  Straughter had known Moore for two years and Zarbaugh for approximately one year.  T III 117-118.  But Straughter had just met Elam about a week before July 18, 2004.  And he had seen her on the morning of July 17, 2004, the day before the murders.  T III 118-155.  Straughter initially met Elam through his friend Jamie.  Straughter did not really know Ray, and had only heard Jamie speak of a person named, "E."  But on the 17th of July, Straughter met "E" and learned that he was Jarius Andrea Perkins.  Straughter also discovered that Perkins was Elam's boyfriend.  T III 129-131.

Straughter related his recent encounter with Perkins and Elam the morning before the shooting at Zarbaugh's house.  Within 24 hours before the murders, Straughter arrived at Zarbaugh's house.  His friend Jamie had brought Elam to the house.  Straughter did not believe that Elam had ever been to Zarbaugh's house before.  T III 128-130.  Upon arriving at the Zarbaugh house, Straughter noticed a strange car in the driveway, a silverish, black on the bottom Explorer.  Elam said the Explorer belonged to her boyfriend and had asked if it was okay if her boyfriend met them at Zarbaugh's house.  Since Elam was white, Straughter had assumed an older white guy was showing up, so he thought it would be no big deal.  T III 129-131.  After Straughter's eye caught the Explorer, he then noticed Elam prancing around like "Cinderella," and then he observed that Perkins, who was sitting in the driver's seat of the Explorer, had a handgun–a Glock Taurus–on his lap.  T III 131-132.

Straughter didn't want to appear afraid, so "I kind of like backed up off of him a little bit and kind of like not letting him feel like I was intimidating by me being bigger than him."  Straughter also went to shake hands with Perkins, but Perkins had his right hand up under the seat.  But Perkins did shake Straughter's hand.  Straughter noticed a little kid was in the passenger seat and seemed to be sleeping.  Straughter did not know why Perkins' hand was under the seat, but the handgun got his attention.  T III 133.  Elam introduced Perkins as her boyfriend, "E."  Straughter recollected that he had heard his friend Jamie talk about "E," but this was his first time meeting "E."  Perkins gave Straughter a look that said, "Get the F— away from me."  Straughter backed on up off the truck and told Elam to get into the truck and leave.  T III 133-134.  Perkins did not say a word.  Zarbaugh went into the house and Jamie stayed outside the house.  Elam then asked Jamie if she was going to go with them.  Jamie said, "No, I'm staying here."  Perkins maintained his still silent look, "the look someone has when they have a gun, they feel brave."  T III 134-135.  Straughter did not know how Perkins got to Zarbaugh's house because that was the first time that Elam had ever been to Zarbaugh's house.  T III 135-136.

Perkins and Elam left, then Straughter left.

Straughter had just been driving when he saw Moore and convinced Moore to drive around with him. T III 119-121. Straughter switched cars with his wife and was driving the same Honda Element he drove when he previously encountered Perkins and Elam as he picked Booker up at her hotel. T III 121. They drove around for a little while then headed for Zarbaugh's house. T III 122.

Zarbaugh called Straughter a lot on the phone that night, so they spoke often. When Straughter talked to Zarbaugh in the early morning hours on the eighteenth, Elam was at Zarbaugh's house. Straughter was not expecting Elam to be at Zarbaugh's house and he was mad that Elam was there, because Zarbaugh's house "was not a drug house and people did not do drug sales out of her house" and Elam wanted to buy drugs from Straughter. T III 123-124, 164. "Elam could have called me from a pay phone like everyone else," Straughter exclaimed. T III 164. Straughter remained puzzled because he did not really know Elam and he had never sold drugs directly to Elam. He had sold Elam rock cocaine the week before through his fifteen-year friend, Jamie. T III 125, 127. Straughter had no dealings directly with Elam. T III 127. Straughter had told Zarbaugh that he would be at her house in an hour or two, but explained his hour or two could be the next day. But when Elam got on the phone, this made Straughter go to Zarbaugh's house right away. Elam indicated she was not going to leave Zarbaugh's house until Straughter got there. T III 167. After Zarbaugh next call[ed], Straughter assured her that he would be there in a minute. Straughter verified that Elam was in fact still at Zarbaugh's house. T III 168. Straughter went right over to Zarbaugh's house. T III 125-126, 168-169.

On July 18, 2004, at two in the morning as Straughter, Moore, and Booker arrived at Zarbaugh's house, Elam was still there. They arrived at Zarbaugh's house a couple of hours after Straughter had said he would be there. Straughter pulled all the way into the driveway–up into the yard. All three exited the car and went to the door. Elam answered the door and let them in. Straughter noticed that Elam was anxious–fidgeting and moving around. Elam's behavior made Straughter nervous. T III 169. Zarbaugh was sitting in the living room. Zarbaugh questioned why Elam was at the house. T III 169. Straughter and Moore went into the kitchen for a short time. Booker never saw a drug transaction. T III 7, 9, 11, 92-93, 35, 14. Straughter handed Zarbaugh $548, talked to Elam for a moment, hugged Straughter, and headed out the door. T III 138-139. Straughter was in Zarbaugh's house approximately five minutes. In that short time, only five minutes, the defendants had pulled into the driveway blocking Straughter's car and were out of their car hollering at Straughter and Booker as they walked out of the house. T III 170. Straughter recognized the silverish Explorer as the same car Perkins was sitting in approximately 24 hours earlier. T III 171-172.

As Straughter and Booker headed down the steps, Perkins and Ray approached them and started hollering "get down." Perkins and Ray had nine millimeter guns pointed at their heads and face. Perkins grabbed Booker and Ray grabbed Straughter, ordering them to lie on the ground. Straughter refused so Ray

6

hit him with the gun making the gun go off. The bullet hit Straughter in the back of his head. T III 140-142. Straughter exclaimed that he thought Ray had blown the back of his head off so he laid on the ground as if he were dead. But Ray kicked him and told him to get up saying, "You ain't dead. Get up." T III 114-16, 127-128, 141-142. Straughter rolled over on his back. He heard Perkins hollering at Booker then Ray started hollering at Straughter, "Where the money at, where the money at?" Straughter said that he did not have much in his pockets. Ray ordered Straughter to give him what he had in his pocket. Ray then asked if there were any guns in the house and Straughter answered "no." Perkins immediately headed toward the house. T III 142, 161. Straughter gave Ray two or three hundred dollars. Ray told Straughter he thought he would have had more money. T III 143. Ray told Booker to get up and come by him, but Booker just laid on the ground. Straughter put his body on top of Booker because Ray kept waving the gun around. "Ray was mad about the situation (not getting more money from Straughter). So he kept on you know like, like he was really going to shoot one of us, you know forcing the gun down like this. So I kept putting my body over the girl." T III 143-144. . . . Three or four minutes after Perkins entered the house armed with the [Glock] Taurus, shots were heard from inside the house. T III 144, 161. Six or seven shots were heard, a short pause, then more shots were heard. T III 20. Ray and Straughter hollered at each other [and] discussed who was getting killed inside the house. Straughter related that Ray exclaimed, "I thought you said it wasn't no guns in the house. I said, ain't nobody [got] no guns in the house. Yo' man is in there killing my people. Ain't nobody got no guns in the house." T III 143-144.

    After several shots were fired, Straughter looked toward the house and saw Perkins and Elam coming out of the house. As Perkins approached the truck, Straughter and Book were still on the ground. Perkins said, either "Let's do them now" or "We got to kill them." Elam questioned, "Why do that? . . . (something about a telephone . . . we got to go . . . come on lets go," "Lets go the police are coming soon." T III 23-24, 77-78, 144-145. When Perkins put the gun in Straughter's face, Straughter grabbed the gun. They wrestled with it. Straughter got the gun from Perkins while Elam was still hollering at Perkins. Ray ordered Straughter to give the gun back and threatened to kill Straughter, Straughter initially refused, but Straughter had his finger on the trigger and it wouldn't pull. The gun was empty. Straughter, thinking he was a goner, gave the gun back. Perkins rushed at Ray to get the gun. Straughter got up, pulled Booker up, then pushed her away from them. As Perkins got the gun from Ray and pointed it at Straughter, Straughter and Booker took off running toward the back of the house. Straughter heard car doors, heard the truck take off, and grabbed Booker who was going into the house. He did not let her go into the house; they went up Northline to the 7-11 store. T III 145-147. Straughter gave Ray his cell phone, money, ring and other things, Booker gave up her purse. T III 153-154.

    Straughter recollected that when he was with Elam the week before he had lots of cash on him and when the four of them were at Zarbaugh's house he had lots of cash on him. In fact, Straughter usually had lots of cash on him. Straughter

admitted, "I'm always flashing (money)." Elam lured Straughter over to Zarbaugh's house by telling him she had $50 and she wanted to talk business, but Straughter admitted that was not the lure–the lure was why she was over at the house in first place. T III 155-156. Straughter wanted her out of the house because he did not like her. Straughter explained that the gun Elam's boyfriend, the defendant, Perkins, had earlier was a gun that belonged to Straughter's friend, Patrick Kessling (but Straughter had always called him Headley). T III 157. Straughter recognized the nine-millimeter Taurus gun held by Perkins because the gun had been stolen from Kessling earlier and Straughter had gotten the gun back for him. Straughter told Kessling how much he paid to get it back and Kessling paid him that amount. The unique aspect of this gun was that it had a gold and green symbol in the middle of the handle; it looked like a gold coin with green around it. T III 158-159. Straughter had sold it back to Kessling about 3-4 months before these robbery-murders. Straughter recognized it immediately when he saw it on Perkins' lap when Perkins was sitting in Zarbaugh's driveway not 24 hours before the murders and when Perkins used it to commit the murders. T III 159.

Straughter identified Perkins in a showup and referred to him as "E." T III 178. But Straughter admitted that he mistakenly identified Perkins as the man who stayed outside with him and held him at gunpoint. Straughter explained that it was Ray who actually held Straughter at gunpoint while Perkins went inside the house. T III 179-181. Straughter picked Ray out of a physical lineup. Ray ordered Straughter to empty his pockets. T III 180. Straughter was very certain that Perkins went into the house just before gun shots were heard and that Ray stayed outside with him the whole time. T III 181. And, Perkins definitely was the one who wanted to kill Straughter and Booker. T III 181.

Moore was also executed in Zarbaugh's home. Moore was hiding behind the couch with his arms over his head. He was shot five times–three to the face, two with the musket imprint left on his skin, one to the arm and one in the abdomen. Straughter and Booker survived this robbery. After eight shots were heard, Perkins and Elam exited the house. Perkins pointed the gun at Straughter, he tried to fire the gun, but the slide was back, there were no bullets. Perkins told Ray to give him his gun, "we got to kill them, we got to kill them." When opportunity presented itself Straughter and Booker took off running. Straughter and Booker went to a 7-Eleven.

Straughter viewed a photo lineup on July 19, 2004; he identified Perkins. The day before the preliminary examination Straughter identified Ray in a live lineup. T III 57-58, 86, 91-92, IV 64. At the preliminary examination Straughter told Officer Smith that Ray was the one who remained outside the house with him and Booker. T IV 65, 70-73. Booker never attended a lineup. She told the police that she would not be able to identify anyone, but she began remembering details when she was at the preliminary examination. She identified Perkins. Booker then identified both Perkins and Ray at trial. T III 29-31, 37, 42, 55, 60-61.

Christopher Imperati of the Romulus police was dispatched at 3:17 a.m. on July 18, 2004 to the 7-Eleven. Imperati met Straughter and Booker who told him about the shooting. Imperati saw that Straughter had a laceration on the back of his

neck. T III 84-86. Imperati found Moore's body in the living room and Zarbaugh's body in a hallway. Straughter gave a minimal description of the perpetrators and the Ford Explorer, but Straughter was pretty sure he could identify the men. T III 89-98.

When Perkins and Ray were arrested, Ray initially asked why he was being arrested. Officer St. Andre replied, "I'm from the Romulus Police Department." Ray then replied, "Does this have to do with the two people killed in Romulus? You need to talk to my cousin. Did you talk to my cousin yet?" T IV 44-47, 155-156.

The testimony of Jarrell James, Perkins' cousin and Ray's uncle-in-law, was that on approximately July 18, 2004, [James] drove with Ray and Perkins in Perkins' Explorer. They picked up Ray and did "guy things." James smoked marijuana and drank vodka. He remembered being at his cousin's house in Detroit. He woke up about 3:00-4:00 in the morning in his cousin's vehicle and Elam was in the car. He had no recollection of going to Romulus. There was no talk about anything that had happened. T IV, 178-186. They dropped Ray off at his home and then went to Perkins' home. T IV 188.

Pl.-Appellee's Br. on Appeal, in *People v. Elam*, No. 260161 (Mich. Ct. App.), at 4-13.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529

U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Double Jeopardy (Claim I)*

Petitioner first contends that her sentences for the two armed robbery convictions violate her right to be free from double jeopardy in light of her sentences for the two felony murder convictions. The court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Fifth Amendment to the United States Constitution commands that no "person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Double Jeopardy Clause, which is applicable to the states through the Due Process Clause of the Fourteenth Amendment, *see Benton v. Maryland*, 395 U.S. 784, 794 (1969), provides three basic protections: "[It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against

11

multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (footnotes omitted). "These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense." *Shiro v. Farley*, 510 U.S. 222, 229 (1994) (citing *United States v. Wilson*, 420 U.S. 332, 339 (1975)).

As noted above, the Double Jeopardy Clause prohibits a state from punishing a defendant twice for the same "offense." However, "[f]or constitutional purposes, it makes no difference that the separate charges against [petitioner] grew out of the same transaction." *Smith v. Sowders*, 848 F.2d 735, 739 (6th Cir. 1988). "Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984) (citations omitted). In making this determination, the Court is bound by the Michigan courts' interpretation of state law. *See Rodgers v. Bock*, 49 Fed. Appx. 596, 597 (6th Cir. 2002); *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989).

2.    *Analysis*

Petitioner contends that because the armed robbery convictions were the predicate felonies for the felony murder convictions she could not, consistent with the Double Jeopardy Clause, be sentenced on both the armed robbery and felony murder convictions. The Michigan Court of Appeals rejected this argument, concluding that it was mistaken as a matter of fact. Specifically, the court explained that the vacated home invasion conviction supplied the predicate felony for the felony murder convictions, and that the armed robberies of Booker and Straughter constituted crimes against different victims which did not supply the predicate felony for the felony murder convictions relating to the deaths of Zarbaugh and Moore. *See Perkins*, 2006 WL 1330320, at *7, slip op. at 7-8.

Because this determination was a reasonable determination of the facts under § 2254(d)(2), the Court should conclude that petitioner is not entitled to habeas relief on this claim.

As noted by the Michigan Court of Appeals, there were four victims in this case: Zarbaugh, Moore, Straughter, and Booker. Only Zarbaugh and Moore were killed, and petitioner's first degree felony murder convictions stem from those deaths. Straughter and Booker were not killed, and as to these victims petitioner was convicted of the separate armed robbery charges. Those robbery charges, involving as they did different victims did not supply the underlying predicate felony supporting the felony murder convictions. Rather, the underlying felony for the first degree murder convictions was the home invasion charge. This was clearly explained to the jury during instructions, in which the court made clear that the defendants could be guilty of first degree felony murder only if the jury found that the murders occurred during the commission of a home invasion, *see* Jury Trial Tr, dated 11/22/04, at 137-40, and in which the court limited the armed robbery charges to the robbery of Booker and Straughter, *see id.* at 147-48. Because the armed robbery convictions arise from the robbery of different victims than the felony murder convictions, petitioner's multiple sentences do not violate her right to be free from double jeopardy. *See Glover v. Booker*, No. 2:08-CV-14519, 2009 WL 2777093, at *5 (E.D. Mich. Aug. 27, 2009) (as a matter of Michigan law defendant may be convicted and sentenced for felony murder and armed robbery involving different victims consistent with the Double Jeopardy Clause). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Sufficiency of the Evidence (Claim II)*

Petitioner next contends that the prosecution presented insufficient evidence to establish her guilt beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas

relief on this claim.

      1.     *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*,

14

*Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. Under Michigan law, first degree murder includes "[*m*]*urder* committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping." MICH. COMP. LAWS § 750.316(1)(b) (emphasis added), as well as murder committed with premeditation, MICH. COMP. LAWS § 750.316(1)(a). Under either theory of first degree murder, the prosecution must show that a defendant had the mental state necessary for murder, that is, malice aforethought. *See generally*, *People v. Aaron*, 409 Mich. 672, 713-21, 299 N.W.2d 304, 319-323 (1980); *People v. Turner*, 213 Mich. App. 558, 556, 540 N.W.2d 728, 732-33 (1995) (per curiam). Under

15

Michigan law, malice is established by showing that the defendant possessed one of three mental states:  (1) intent to kill; (2) intent to do serious bodily harm; or (3) wanton and willful disregard for the likelihood that the natural tendency of his act is to cause death or great bodily harm.  *See Aaron*, 409 Mich. at 733, 299 N.W.2d at 328.  Thus, the elements of first degree felony murder are: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result; (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in M.C.L. § 750.316." *Turner*, 213 Mich. App. at 566, 540 N.W.2d at 732.

Further, MICH. COMP. LAWS § 767.39 abolished the common law distinction between aiders and abettors and principals, and provides that aiders and abettors may be prosecuted and convicted as though they had directly participated in the crime.  *See People v. Palmer*, 392 Mich. 370, 378, 220 N.W.2d 393, 396 (1974).  Aiding and abetting under Michigan law requires proof of three elements: (1) commission of the underlying crime either by the defendant or some other person; (2) acts or encouragement by the defendant which aided or assisted the commission of the crime; and (3) intent on the part of the defendant to commit the crime or knowledge by the defendant that the principal intended to commit the crime at the time aid or encouragement was given.  *See People v. Acosta*, 153 Mich. App. 504, 511-12, 396 N.W.2d 463, 467 (1986) (per curiam).  Thus, "[t]o prove felony murder on an aiding and abetting theory, the prosecution must show that the defendant (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing,

16

attempting to commit, or assisting in the commission of the predicate felony." *People v. Riley*, 468

Mich. 135, 140, 659 N.W.2d 611, 614 (2003).

    2.    *Analysis*

    Petitioner contends that there was insufficient evidence to support her convictions for felony

murder under an aiding and abetting theory because the prosecution did not present evidence that

she assisted in either the underlying felony (home invasion) or the killings.  Rather, she contends,

the evidence shows no more than mere presence, which is insufficient to support her convictions on

an aiding and abetting theory.  The Michigan Court of Appeals rejected this claim, reasoning:

> The evidence showed that defendant Elam was the only person who knew both Straughter and Zarbaugh. Defendant Elam also knew that Straughter always carried large sums of money. Despite the fact that defendant Elam's boyfriend, defendant Perkins, sold drugs, defendant Elam attempted to entice Straughter to come over to Zarbaugh's house to buy $50 worth of drugs stating she wanted to talk business. Defendant Elam was insistent that Straughter come over to Zarbaugh's house and would not leave until he arrived. After the final telephone call with Straughter when he stated he was going to be heading over shortly, less than one minute later a telephone call was placed from Zarbaugh's home phone to defendant Perkins's cellular telephone. After they arrived, Straughter, Booker, and Moore were only in the house for about five minutes. Straughter gave Zarbaugh over $500 cash and then Straughter and Booker headed out the front door of the house while defendant Elam spoke with Moore. As they headed out of the house defendants Perkins and Ray were already there and rushed them with handguns drawn. Defendants Perkins and Ray robbed Straughter and Booker at gunpoint, then while defendant Ray stood over Straughter and Booker outside the house at gunpoint, defendant Perkins joined defendant Elam inside the house where Zarbaugh and Moore were both shot execution style and the cash Straughter left for Zarbaugh was taken. After once again threatening Straughter and Booker with guns, discussing killing them, but the guns did not discharge, all three defendants fled the scene in defendant Perkins's silver Explorer.
>
> This evidence is enough to fulfill all the elements of the crimes. At a minimum, the evidence showed that defendant Elam worked in unison with her codefendants and that she performed acts or gave encouragement, i.e., enticing Straughter to come to Zarbaugh's house, repeatedly letting him know throughout the night that she was still at Zarbaugh's house, calling defendant Perkins only one minute after she had confirmation that Straughter was expected at Zarbaugh's house shortly, remaining inside the house after defendant Perkins ran in armed with a

loaded weapon, remaining inside the house as shots were fired, and then ultimately exiting the house and fleeing the scene with defendant Perkins. The overwhelming evidence displayed that defendant Elam was an active participant in the crimes, not an innocent, passive bystander. To the extent that there was any conflicting evidence regarding the nature of her involvement and credibility issues relative to the prosecution's witnesses, such matters are left to the jury for resolution and not this Court. Furthermore, the fact that multiple victims were shot in the head at close range (execution style), clearly provides evidence of malice, premeditation, and deliberation.

*Perkins*, 2006 WL 1330320, at *9, slip op. at 10. This determination was reasonable.

Contrary to petitioner's argument there was ample evidence presented at trial that she was more than a mere bystander, and that she actively assisted the principles in committing the home invasion, robberies, and murders. The testimony of Straughter and Booker, if believed by the jury, established that petitioner had invited her boyfriend, codefendant Perkins, to Zarbaugh's house on the morning of the murder. Petitioner was "dancing around" when she arrived at Zarbaugh's house, where Perkins was already parked in his Explorer. At that time, Perkins had a gun on him in his lap. *See* Trial Tr., dated 11/16/04, at 129-36. Petitioner had never before been to Zarbaugh's house. Later in the evening, Straughter phoned Zarbaugh's house, and learned that petitioner had shown up there uninvited. Petitioner indicated that she wanted to buy drugs from Straughter, even though Straughter had never directly sold drugs to petitioner and had never sold drugs at Zarbaugh's house. *See id*. at 123-25, 164. Petitioner also indicated that she was going to stay at Zarbaugh's house until Straughter arrived. Straughter indicated he would come over, and called Zarbaugh's house again a couple of hours later to indicate that he was coming over, at which point petitioner again stated that she had $50 and wanted to talk business. Even though petitioner had been at Zarbaugh's for several hours by this time, Perkins and Ray showed up within minutes of Straughter arriving at Zarbaugh's house. *See id*. at 170. When Straughter arrived, petitioner was anxious and moving

18

around a lot. *See id.* at 169. Petitioner also assisted Perkins and Ray in fleeing the scene, and left

with them. *See id.* at 23-24, 77-78, 144-45. Most damning of all, the phone records for Zarbaugh's

house confirm that petitioner repeatedly tried to get Straughter over to Zarbaugh's house and kept

in contact with Perkins during this time. The phone records showed calls from Straughter's cell

phone to Zarbaugh's house at 12:39 a.m. and again at 2:25 a.m. At 2:47 a.m.–22 minutes later–a

call was placed from Zarbaugh's home to Perkins's cell phone. At 2:55 a.m., a call was placed from

Zarbaugh's home to Straughter's cell phone, and a mere one minute later a call was placed to

Perkins's cell phone. *See* Trial Tr., dated 11/18/04, at 159-62.

From Straughter's and Booker's testimony, as well as the phone records, a rational jury could

have concluded beyond a reasonable doubt that petitioner came to Zarbaugh's house, where she had

never been before that day, in order to lure Straughter over there as part of a robbery plan. Earlier

in the day, petitioner had invited Perkins to Zarbaugh's house even though neither Zarbaugh nor

Straughter had ever met him and petitioner had never been to Zarbaugh's house. At that time,

Perkins was armed with a gun which he had on his lap. The evidence also established that petitioner

repeatedly requested Straughter's presence at Zarbaugh's house, and remained in telephone contact

with Perkins while she was trying to get Straughter over to Zarbaugh's house. The three calls

beginning at 2:47 a.m.–first to Perkins, then to Straughter, and then again to Perkins–suggest that

petitioner was coordinating the arrivals of Straughter and Perkins, and explains the coincidence (as

petitioner would have it) of Perkins and Ray arriving just minutes after Straughter, even though

petitioner had been at Zarbaugh's house for several hours. Petitioner remained in the home during

the entire episode and remained unharmed, even though Perkins intended to leave no witnesses by

shooting all four victims, and fled the scene with Perkins and Ray. This evidence, if believed by the

19

jury, is sufficient to establish that petitioner was an active participant in the crimes, and both intended and participated in their commission.  This is so even though the evidence could be viewed in a different light as establishing only petitioner's presence.  The fact that the evidence may have supported another version of events is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient.  *See Jackson*, 443 U.S. at 326.

Further, although not directly challenged by petitioner, there was evidence that petitioner acted with the necessary malice aforethought sufficient to sustain her murder convictions.  It is well established that the malice element of second degree murder may be inferred from the circumstances of the death.  *See People v. Werner*, 254 Mich. App. 528, 531, 659 N.W.2d 688, 692 (2002); *People v. Mackey*, 168 Mich. App. 154, 157, 423 N.W.2d 604, 606 (1988).  In particular, malice may be inferred from evidence that establishes "the intent to do an act that is in obvious disregard of life-endangering consequences." *People v. Aldrich*, 246 Mich. App. 101, 123, 631 N.W.2d 67, 80 (2001).  From the evidence discussed above, a rational trier of fact could have concluded that petitioner assisted in "intentionally set[ting] in motion a force likely to cause death or great bodily harm," *Aaron*, 409 Mich. at 729, 299 N.W.2d at 327; *accord People v. Cairns*, 460 Mich. 750, 759, 597 N.W.2d 130, 136 (1999), and thus acted with malice aforethought.  *See Turner*, 213 Mich. App. at 572-73, 540 N.W.2d at 735 (evidence sufficient where defendant knew his codefendent intended to commit robbery while armed, as such evidence showed that defendant acted with wanton and willful disregard sufficient to show malice).  Thus, the Michigan Court of Appeals's determination was a reasonable application of the *Jackson* standard, and the Court should therefore conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Evidence and Prosecutorial Misconduct Claims (Claims III and IV)*

Petitioner next contends that she was denied a fair trial by the introduction of pictures of the victims, which she contends were gruesome. She also contends that the prosecutor committed misconduct by introducing pictures of the victims with their children in an attempt to appeal the jury's sympathy. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1. *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection

21

or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

Similarly, for habeas relief to be warranted on the basis of prosecutorial misconduct it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

    2.    *Analysis*

*a. Crime Scene Photo*

Petitioner first contends that she was denied a fair trial by the introduction of a photograph of Zarbaugh's and Moore's dead bodies.  The Michigan Court of Appeals rejected petitioner's claim, reasoning:

> Photographs of a murder victim are not inadmissible merely because they accurately portrayed a brutal murder. Photographs that do not present an enhanced or altered presentation of the injuries, though graphic, may be admissible. Defendant Elam has presented no evidence that the photographs here were taken to particularly emphasize the gore, or were taken from a particularly gruesome angle, or were in any way altered or enhanced. The photographs provided the jury with a visual depiction of the scene of the murders. The photographs oriented the jury regarding the position of the bodies. Contrary to defendant Elam's argument, the photographs were relevant to show that the location of the gunshot wounds on the victims was plausibly consistent with the prosecutor's theory that defendants murdered the victims "execution" style. Although unpleasant, we do not find that the trial court abused its discretion in finding that the photographs' prejudicial effect did not substantially outweigh their probative value.

*Perkins*, 2006 WL 1330320, at *10, slip op. at 11 (citations omitted).  The Court should conclude that this determination was reasonable.

As the court of appeals noted, because there were no eyewitnesses to the actual shootings, the photograph of the victim's bodies was relevant to support the prosecution's theory that the murders were "execution style" murders, which in turn was relevant to the mental state elements of the murder charges against petitioner and her codefendants.  "The admission of relevant photographs of a crime scene or victim, even if gruesome, does not deprive a criminal defendant of a fair trial." *Skrzycki v. Lafler*. 347 F. Supp. 2d 448, 455 (E.D. Mich. 2004) (Gadola, J.); *see also*, *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (admission of gruesome photographs generally does not "raise[] the specter of fundamental unfairness such as to violate federal due process law."); *Pearl v. Cason*, 219 F. Supp. 2d 820, 830 (E.D. Mich. 2002) (Edmunds, J.) ("[A] challenge to the admission of a gruesome photograph does not present a question of constitutional magnitude."); *cf.*

*Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b.  Photos of Victims with Their Children

Petitioner also contends that the prosecutor committed misconduct by introducing photographs of the victims' children in an attempt to elicit sympathy from the jury.  The Court should conclude that petitioner is not entitled to habeas relief on these claims because they are procedurally defaulted.  Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989).  Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim."  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

The Michigan Court of Appeals found that a review of this claim was barred by petitioner's failure to object to the introduction of the photographs at trial.  *See Perkins*, 2006 WL 1330320, at *10, slip op. at 11 ("Defendant Elam did not preserve these claimed errors by timely and specifically

objecting to the allegedly improper conduct below.") (quotation omitted).  The record confirms that none of the counsel for the three defendants objected to the introduction of these photographs.  *See* Trial Tr., dated 11/15/04, at 77, 81-82.  This contemporaneous objection rule was firmly established at the time of petitioner's trial.  *See, e.g.*, *People v. Duncan*, 402 Mich. 1, 15-16, 260 N.W.2d 58, 61-62 (1977); *People v. Curry*, 175 Mich. App. 33, 39, 437 N.W.2d 310, 314 (1989).  As the state court clearly and expressly relied on this state procedural rule with respect to petitioner's jury instruction and prosecutorial misconduct claims, these claims are barred absent a showing of either cause and prejudice or a fundamental miscarriage of justice.  *See Engle v. Isaac*, 456 U.S. 107, 125-129 (1982) (state contemporaneous objection rule is adequate procedural bar precluding consideration of habeas claims).  Further, this conclusion is not altered by the fact that the Michigan Court of Appeals did consider the merits of petitioner's prosecutorial misconduct claims.  It is clear that the court of appeals did so only in the context of determining whether petitioner could establish plain error to overcome her procedural default.  "[P]lain error review by the state court does not constitute a waiver of procedural default rules."  *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *see also*, *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

Petitioner can still have the merits of her defaulted claim considered if she shows cause for, and prejudice attributable to, her procedural default.  To establish "cause," petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray*, 477 U.S. at 488; *see also*, *Coleman*, 501 U.S. at 753.  However, petitioner asserts no cause for her procedural default, and none is apparent from the record.  The only conceivable basis for cause would be counsel's failure to object, but petitioner cannot assert counsel's ineffectiveness as cause.  As the Supreme Court has observed, "in certain circumstances

counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to establish cause. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray*, 477 U.S. at 488-89). In order to constitute cause, however, counsel's performance must amount to ineffective assistance of counsel under the Sixth Amendment. *See id*. "In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." *Id*. For this reason, the ineffective assistance claim which is asserted as cause must itself be both exhausted, *see id*. at 451-52 (discussing *Murray*, 477 U.S. at 489), and not procedurally defaulted, *see id*. at 452-53. Here, petitioner has never presented, in any fashion, an ineffective assistance of counsel claim to the Michigan courts. Such a claim is therefore unexhausted, and cannot be used as a basis to establish cause to overcome her procedural default. *See Lott v. Coyle*, 261 F.3d 594, 608-09 (6th Cir. 2001). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's first three claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law, and that review of petitioner's fourth claim is barred by her procedural default in the state courts. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver

of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives_____
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: <u>10/2/09</u>


<div style="border:1px solid black;">

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on October 2, 2009.

                    s/Eddrey Butts_____
                    Case Manager

</div>

27